**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Christopher Cole

    v.                                     Civil No. 11-cv-018-JL

Robert Thyng et al.

**REPORT AND RECOMMENDATION**

Before the court is pro se plaintiff Christopher Cole's complaint, construed to consist of the original complaint and the addenda, amendments, and exhibits thereto (doc. nos. 1, 11, 16-18, 21, 26-27, 30, and 39).  The complaint asserts claims against defendant officers and supervisors at the Northern New Hampshire Correctional Facility ("NCF"), including NCF Unit Manager Robert Thyng; NCF Unit Supervisor Sgt. Masse, whose first name is unknown ("FNU"); NCF Cpl. FNU Dube; and a male NCF Correctional Officer ("CO"), FNU Schnyder.  The matter is before the court for preliminary review to determine if Cole has stated a claim upon which relief can be granted.  See 28 U.S.C. § 1915A; United States District Court, District of New Hampshire Local Rule ("LR") 4.3(d)(2) (inmate complaints and amendments are forwarded to the magistrate judge for preliminary review).

**Standard of Review**

Under LR 4.3(d)(2), when an incarcerated plaintiff
commences an action pro se, the magistrate judge conducts a
preliminary review.  The magistrate judge may issue a report and
recommendation after the initial review, recommending that
claims be dismissed if the court lacks subject matter
jurisdiction, the defendant is immune from the relief sought,
the complaint fails to state a claim upon which relief may be
granted, the allegation of poverty is untrue, or the action is
frivolous or malicious.  See id. (citing 28 U.S.C. § 1915A &
Fed. R. Civ. P. 12(b)(1)).  In conducting a preliminary review,
the magistrate judge construes pro se pleadings liberally, to
avoid inappropriately stringent rules and unnecessary
dismissals.  See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per
curiam) (following Estelle v. Gamble, 429 U.S. 97, 106 (1976),
to construe pleadings liberally in favor of pro se party);
Castro v. United States, 540 U.S. 375, 381 (2003).

To determine if a complaint states any claim upon which
relief could be granted, the court applies a standard analogous
to that used in reviewing a motion to dismiss filed under Fed.
R. Civ. P. 12(b)(6).  The court decides whether the complaint
contains sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face.  See <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, ___ , 129 S. Ct. 1937, 1949 (2009).

To make this determination, the court employs a two-pronged approach.  See <u>Ocasio-Hernández v. Fortuño-Burset</u>, 640 F.3d 1, 12 (1st Cir. 2011).  The court first screens the complaint for statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action." <u>Id.</u> (citations, internal quotation marks and alterations omitted).  A claim consisting of little more than "allegations that merely parrot the elements of the cause of action" may be dismissed.  <u>Id.</u>  The second part of the test requires the court to credit as true all non-conclusory factual allegations and the reasonable inferences drawn from those allegations, and then to determine if the claim is plausible.  <u>Id.</u>  The plausibility requirement "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of illegal conduct.  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 556 (2007). The "make-or-break standard" is that those allegations and inferences, taken as true, "must state a plausible, not a merely conceivable, case for relief."  <u>Sepúlveda-Villarini v. Dep't of Educ.</u>, 628 F.3d 25, 29 (1st Cir. 2010); <u>see</u> <u>Twombly</u>, 550 U.S. at 555-56 ("Factual allegations must be enough to raise a right to

relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." (citations and footnote omitted)).

Evaluating the plausibility of a claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at ___, 129 S. Ct. at 1950 (citation omitted).  In doing so, the court may not disregard properly pleaded factual allegations or "attempt to forecast a plaintiff's likelihood of success on the merits." Ocasio-Hernández, 640 F.3d at 13.  "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." Id.

## Background

Cole is an inmate currently housed in the Secure Housing Unit ("SHU") in the New Hampshire State Prison for Men in Concord, New Hampshire.  Cole was transferred to the SHU from NCF on January 11, 2011, for protective custody reasons.  The claims in this case arise from events that occurred between November 24, 2010, and January 11, 2011, while Cole was at NCF. During that time, Cole was classified in "pending administrative review" status ("PAR").  Cole was so classified pending a final

4

determination on his request for protective custody relating to threats Cole received from gang members in the Closed Custody Unit ("CCU") at NCF, where he had been housed prior to November 24, 2010.

## I.   Physical Activity and Out-of-Cell Time

Cole asserts that during the seven weeks he was in PAR status at NCF, he was unable to partake in any out-of-cell exercise or recreation.  Recreational programming is never offered to inmates in the reception/segregation unit ("Rec/Seg Unit") where he was housed for most of his seven week tenure in PAR status.  Cole asserts that his cell in the Rec/Seg Unit was too small for recreation or physical activity.  When Cole asked for out-of-cell time, he was offered the use of another similarly-sized cell without a toilet or bunk, known as a "dry tank," typically used for punitive segregation.

While in PAR status at NCF, Cole complained on a daily basis about the lack of recreation and exercise.  On November 24, 2010, Cole submitted an inmate request slip to Thyng, complaining that he had not been provided out-of-cell time, or "tier time," since November 24, 2010, and requesting permission to walk on the tier.  That inmate request slip was redirected to Sgt. Masse.

On December 20, 2010, Masse responded, denying Cole's request to walk on the tier, citing Cole's protective custody status as the reason for the denial.  In his response, Masse repeated his offer to use a dry tank for recreation, as those cells were generally available for that purpose on a daily basis.

Masse's offer of recreation time in a dry tank was unacceptable to Cole.  Cole asserts that the dry tanks were as small as his own cell and were unsanitary due to "blood, mucus, and other unidentifiable stains on the walls and floors."  Am. Compl. (doc. no. 39) at 5.

Cole attempted to grieve the lack of out-of-cell time on December 24, but that grievance "disappeared along with a few other grievances."  Id.  Cole repeated his claims in a grievance addressed to the warden dated December 29, 2010.  Ex. B to Compl. (doc. no. 18-1, at 2).  Cole also asserted in that grievance that his days were filled with "anger, depression, and . . . misery," due to lack of recreation and exercise, and the staff's "complete disregard" for his physical and mental health. Id.  On January 4, 2011, defendant Thyng, acting for the warden, denied Cole's grievance, citing the fact that Cole had been

offered, and refused, one hour of out-of-cell time daily on numerous occasions.  Id.

Cole submitted similar grievances to the New Hampshire Department of Corrections Commissioner's office on January 4, February 13, and May 1, 2011.  See Ex. H to First Am. Compl. (doc. no. 26-1, at 1).  Only the May 1 grievance yielded a response.  Chris Kench, acting on behalf of the commissioner, denied the grievance, but stated that the commissioner would "look into segregation practices at the NCF."  First Am. Compl. Ex. "J" (doc. no. 26-3, at 1).

II.  Mental and Physical Health

Cole believes the lack of out-of-cell exercise and recreation in the Rec/Seg Unit adversely affected his mental and physical health.  While in the unit, Cole suffered from constipation, cramps, migraines, weakness, and psychological harm.

Cole asserts that prior to December 13, 2010, nurses at sick call instructed him to purchase -- through the prison canteen -- stool softeners, ibuprofen, and antacids to treat his constipation, headaches, and indigestion, but because he could not order those items while in the Rec/Seg Unit, his symptoms remained untreated until late December, when he received

7

prescription medications for constipation and headaches.  Cole
requested prescription multivitamins or a dietary supplement to
help him feel stronger but the medical department denied his
request.

While in PAR status at NCF, Cole met with mental health
professionals and was prescribed Thorazine, an anti-psychotic
medication, and two anti-depressants, Zoloft and Wellbutrin.
Cole was also prescribed a medication called hydroxyzine, for
purposes that he has not specified.  Cole claims he spent days
in a "numb, lethargic depression, pretty much staring at the
wall."  Compl. (doc. no. 1).  Cole told NCF counselors that he
was not getting out-of-cell time, but they could not help him
obtain out-of-cell time.

Cole became so "aggravated, bored, and depressed" that he
cut himself in an attempt to relieve the "aggravation" caused by
the treatment he received in the Rec/Seg Unit.  Am. Compl. at 16
(doc. no. 39).  On two occasions, Cole requested, but did not
immediately receive, mental health assistance.  On December 16,
2010, sometime after 1 p.m., Cole asked Cpl. Dube to contact the
prison's mental health department so that Cole could speak to a
counselor as he believed that he was having an anxiety attack.

Cole did not see anyone from mental health services on that occasion.

On December 18, 2010, Cole asked COs L'Heureux and Schnyder to allow him to see a mental health counselor.  The officers ignored Cole.  Cole then made a wrist-cutting motion to get the attention of CO Murphy.  Murphy asked Cole if he was trying to say that he wanted to hurt himself.  Cole told Murphy that he was not threatening to hurt himself and was only trying to get her attention since L'Heureux and Schnyder had ignored him.  Murphy told Cole that the mental health staff was not at NCF, as it was a weekend.  Instead, Murphy called a nurse and explained the situation, including the fact that Cole did not intend to hurt himself.  Murphy then told Cole that a nurse would not be coming to see him at that time, but that he should go to mental health sick call.

On December 21, 2010, Cole requested sick call because he was feeling weak.  He told the nurse that he needed something so that he could feel stronger, and that he only ate two meals a day.  The nurse advised Cole to increase his daily calorie intake by eating more frequently.

III.  Library and Canteen

While housed in the Rec/Seg Unit, Cole was not allowed to visit the law library and was denied access to the recreational library.  Additionally, he was denied access to certain canteen items, including coffee and tea.

On December 13, 2010, Cole sent an inmate request slip to the NCF law librarian, Ms. Poulin, asking for law library access.  Poulin responded on December 16, 2010, stating that Masse told her that Cole needed to remain in the Rec/Seg Unit at all times for his safety.  Cole was permitted to submit request slips to ask for copies of legal materials.  Cole states that he lacked sufficient funds in his inmate account, however, to pay for copies of legal materials.  It was difficult for Cole to identify materials to request without being able to visit the library.  Cole has asserted that, because he could not go to the library to research issues, he was delayed in filing a complaint in this court that included all of his claims.

IV.  Harassment and Excessive Force Allegations

A.  Sign

On December 12, 2010, Cole asserts that CO Schnyder and another officer harassed him by placing a sign on his door with a picture of a hand.  The officers told Cole to "talk to the

hand."  The court presumes this gesture by the officers was intended to communicate to Cole that they were not interested in listening to his requests or complaints.

B.   Clothesline

On December 16, 2010, Cpl. Dube, in CO Schnyder's presence, ordered Cole to take down a clothesline that Cole had been using to dry clothes in his cell for twenty-two days.  Cole refused to take down the clothesline and called Schnyder a "faggot."  Cole was removed from his cell, and his cell was searched.  A razor was found in his cell and confiscated.  These incidents resulted in a disciplinary report being filed against Cole.

Cole asserts that Dube ordered him to take down the clothesline, after failing to raise the issue for twenty-two days, because, in the interim, Cole had "asked for things such as law library and recreation," and had said "that if they do not provide me with what I have a right to, then I'm going to the court."  Mot. to Am. (doc. no. 11), at 1.

C.   "High Beam"

Early in the day on December 18, 2010, Cole attempted to joke with an inmate who was being released.  Sgt. McFarland ordered Cole to be quiet.  Cole and McFarland began to argue.

When Cole refused to stop talking, McFarland told Schnyder to turn on the "high beam" light in Cole's cell and to leave it on for the whole day.

    D.   Bunk Issues

    For the first three weeks Cole was in the Rec/Seg Unit, he slept on the bottom bunk in his cell.  When a cellmate moved in for several days, the cellmate slept on the top bunk.  It appears that between November 24 and December 15, Cole was either assigned to the bottom bunk, or was assigned to the top bunk, but the assignment was not enforced by the prison staff.

    Cole asserts here that he had difficulty climbing to the top bunk because of its height and shape, and because of his physical condition and medications.  Cole is 5 feet 10 inches tall, and the top bunk was shoulder-height for him.  The edges of the top bunk frame, which Cole says are sharp, protruded about six inches over the edge of the bottom bunk.  The cell lacked any chair, desk, or step to use for climbing other than the lower bunk.  Cole asserts that his medications made him tired and lightheaded, and that when he tried to climb to the top bunk from the lower bunk, he could not do so without hurting himself.  Cole therefore chose to sleep on the bottom bunk or on the floor, if he had a cellmate assigned to the bottom bunk.

Cole claims that inmates without cellmates typically take the
bottom bunk.  Cole's cellmate was willing to sleep on the top
bunk, but the officers still required Cole to move to the top
bunk.

Between December 16 and December 20, officers enforced a
top bunk assignment for Cole.  Cole was charged with "being out
of place" or "disobeying an officer," in seven disciplinary
reports issued during that time, for failing to comply with his
top bunk assignment.

On December 19 at 8:20 p.m., Cole was being held in
segregation in a dry tank.  Sgt. Pelletier approached Cole to
tell him that he would be released back to his cell, but that
Cole would have to move to the top bunk once there.  Cole
refused, telling Pelletier that he would not move to the top
bunk unless he was given a chair to step on.  Pelletier declined
to give Cole a chair and extended Cole's time in segregation for
two hours.  Pelletier charged Cole with a disciplinary violation
for refusing an order to move to the top bunk.

That night, when Cole was moved back to his cell, he moved
his mattress from the top bunk to the floor.  The following
morning, Cpl. Dube discovered that Cole had moved his mattress
to the floor.  Dube told Cole to move his mattress back to the

top bunk or risk a disciplinary report for being found out of place.  A nurse was also in Cole's cell at the time, so Cole, in Dube's presence, asked her for a temporary bottom bunk pass. The nurse listened to Cole's explanation of why he could not climb to the top bunk and asked Dube how other inmates climb up. Dube said that they stand on the bottom bunk.  The medical records Cole has filed here show that Nurse Edwards reviewed Cole's request for a bottom bunk pass and found that Cole had "no medical issues and no current injuries to report."  Cole's request for a bottom bunk pass was denied.  Ex. to Mot. to Am. (doc. no. 11-1) at 9.  Edwards recorded in Cole's medical record that the issue was "reported to U/M Thyng who will address." Id.

Later that day, Dube again found Cole's mattress on the floor and told Cole to put it back on the top bunk.  When Cole refused, Dube took away the mattress, told Cole that it would be returned that night, and charged Cole with disobeying an order. Cole did not receive a replacement mattress for two days, despite repeated requests.  Cole spent two nights sleeping on the floor with only his pillow and blankets.

Cole pleaded not guilty to all of the disciplinary charges related to his bunk assignment.  An investigator took statements

14

from Cole and the charging officers to determine if the disciplinary reports were true.  The investigator noted Cole's statement that he could not climb to the top bunk, but also noted that the medical department had confirmed that there was no medical basis for Cole's alleged inability to climb onto the top bunk.  The investigator generally found the disciplinary reports to be true and recommended processing each of the disciplinary reports as a "minor" disciplinary charge.  Exs. P-T to Am. Compl.

Cole asserts that, on December 26, he had a hearing before Lt. Berwick on all of the disciplinary charges pending against him.  While the complaint does not state the specific resolution of each charge, Cole asserts that, during the hearing, he had an opportunity to explain the bunk issues to Lt. Berwick, and that Berwick swiftly arranged for Cole to be reassigned to the bottom bunk.

> E.   Cell Extraction and Handcuffing

On December 18, 2010, at approximately 9:55 a.m., Cole was sitting in his cell on the bottom bunk, having previously refused an order to move to the top bunk.  Officers L'Heureux, Schnyder, Gauthier, and Watson came to search Cole's cell.  The cell door was closed and locked, but the tray slot in Cole's

cell door was open.  Schnyder told Cole to back up to the door
and to stick his arms out behind him through the tray slot.
Cole was complying with this directive when Schnyder "viciously"
grabbed Cole's hands and pulled them out of the door slot.  Ex.
1 to Mot. to Am. (doc. no. 11-1), at 5.  In so doing, Schnyder
caused the slot edges to scrape Cole's forearms, resulting in
abrasions.  See id.

        Schnyder opened the door with Cole's arms extended behind
him and handcuffed him tightly.  Watson, who witnessed
Schnyder's actions, intervened at that time by asking Schnyder
to turn Cole over to Watson.  Cole believes that Watson's tone
of voice at that time suggested that Schnyder was too angry to
handle Cole correctly.  See Ex. 1 to Mot. to Am. (doc. no. 11-
1), at 5.  Watson then "very respectfully" escorted Cole to a
dry tank down the hall.

        Cole asked for medical attention, and a nurse arrived
promptly to see him.  The nurse's notes indicate that Cole had
abrasions on both forearms and a small abrasion on his left
wrist.  Ex. to Mot. to Am. (doc. no. 11-1) at 9.  Cole asserts
that the tray slot caused the abrasions on his forearms, and the
handcuffs caused the abrasion on his wrist.  The nurse advised

Cole to apply bacitracin to the abrasions for a few days and left two packages of bacitracin for Cole's use.  <u>Id.</u>

    F.   <u>Cell Searches and Unauthorized Seizure of Property</u>

On December 16, 2010, Dube and Schnyder searched Cole's cell.  After the search, Cole noted that two of his books on theosophy had been taken.  When Cole complained to Dube, the officer "said something about [Cole's] status not allowing" him to have those books.  Cole asserts that prison policy states that all inmates are to have access to religious books.  Cole does not specify whether or when the books were returned.

On December 19, Officers Griffin and Ferron conducted a brief search of Cole's cell.  Cole and Griffin engaged in an argument wherein Griffin called Cole a "bitch," and Cole responded with a crude remark.  In response, Griffin placed Cole in segregation in a dry tank while officers searched Cole's cell again.

When Cole returned to his cell that evening, his cellmate was on the bottom bunk, Cole's belongings had been moved to the top bunk, and Cole's legal paperwork, clean clothes, religious literature, stationery, stamps, and bacitracin were missing. The following day, officers returned all of Cole's items, except the bacitracin.

G.   Thyng's Warning and Transfers

On December 28 or 29, Unit Manager Thyng met with Cole regarding his law library access.  At that time, Cole asked Thyng for six blank grievance forms.  Thyng said to Cole that filing grievances would extend his stay in the Rec/Seg Unit while the grievances were investigated.  Cole interpreted that remark as a veiled threat, but chose to file grievances anyway.

On December 31, Dube told Cole that he would be moved back to the CCU, but would remain in PAR status and be housed without a cellmate.  Cole was sent to the CCU and remained there for one week, until January 6, 2011, when he was transferred back to the Rec/Seg Unit.

While Cole was housed in the CCU, other CCU inmates threatened and harassed him, going so far, on one occasion, as to squirt urine and feces under Cole's cell door.  Cole attempted to seek redress by sending an inmate request slip to the CCU unit manager, but received no response.  The threats and harassment from CCU inmates ended only when Cole was transferred back to the Rec/Seg Unit on January 6, 2011.  Five days later, on January 11, 2011, Cole was transferred to the Concord SHU.

Cole remained in PAR status at NCF for a total of 47 days. Cole asserts that during that time, prison officials failed to comply with prison regulations concerning PAR status inmates, which generally provide that PAR status inmates are to receive access to programing similar to other inmates.  Cole also notes that prison officials at NCF did not comply, in his case, with procedures required by prison policy concerning PAR status inmates.

V.   Claims

Cole asserts the following claims in the complaint[1]:

    1.   Defendants violated Cole's Eighth Amendment right not to be subjected to inhumane conditions of confinement when: (a) Masse and Thyng refused to provide him with out-of-cell time and physical exercise for forty-seven days; and (b) failed to provide him with adequate medical care for his serious medical and mental health needs.

    2.   The severity of the restrictions imposed upon Cole while he was on PAR status at NCF violated his right to due process under the Fourteenth Amendment.

    3.   Defendants violated Cole's First and Fourteenth Amendment right to access the courts by restricting his ability to use the law library while he was in the Rec/Seg Unit.

---

    [1]The claims identified herein shall be considered to be the claims asserted in this action.  If Cole disagrees with this identification of his claims, he must properly file either an objection to this report and recommendation or a motion to amend the complaint.

4.   Officer Schnyder used excessive force, in violation of Cole's Eighth Amendment rights by: (a) pulling Cole's arms roughly against the sharp edges of a tray slot in Cole's cell door; and (b) overtightening Cole's handcuffs, resulting in an abrasion on Cole's left wrist.

5.   In violation of Cole's First and Fourteenth Amendment right to petition the government for the redress of grievances, defendants retaliated against Cole, in the following manner, for attempting to file grievances and for threatening to file a federal court complaint:

a.   On December 12, CO Schnyder and another officer harassed Cole by posting a picture of a hand on his cell and telling him to talk to the hand.

b.   Cpl. Dube ordered Cole to remove a clothesline on December 16, which Cole had been using for twenty-two days without incident.

c.   During a December 16 cell search, Officer Schnyder and Cpl. Dube seized two religious books from Cole's cell.

d.   On December 18, Officer Schnyder caused a "high beam" to be left on in Cole's cell for one day.

e.   On December 18, corrections officers searched Cole's cell and seized items including legal materials, books, and a tube of bacitracin.

f.   On December 18, Officer Schnyder used unnecessary force in extracting Cole from his cell and in handcuffing him, prior to searching Cole's cell.

g.   On December 16-20, corrections officers filed disciplinary reports against Cole for not being in the top bunk, and for failing to move to the top bunk when ordered to do so.

h.   Cole had to sleep on the floor for two nights because Cpl. Dube took his mattress, and the mattress was not replaced for two days.

   i. On December 28 or 29, Unit Manager Thyng
indirectly threatened to extend Cole's time at NCF if
Cole were to file grievances.

   j. On December 31, 2010, Cpl. Dube transferred
Cole to the NCF CCU, knowing that Cole had claimed
that inmates in the CCU posed a threat to his health
and safety.

**Discussion**

I. <u>Section 1983</u>

  42 U.S.C. § 1983 creates a cause of action against those
who, acting under color of state law, deprive persons of their
federal constitutional or statutory rights.  <u>Wilson v. Town of
Mendon</u>, 294 F.3d 1, 6 (1st Cir. 2002).  Section 1983 provides
that:

> Every person who under color of any statute,
> ordinance, regulation, custom, or usage, of any State
> or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof
> to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall
> be liable to the party injured in an action at law
> . . . .

42 U.S.C. § 1983.

  Cole alleges violations of his federal constitutional
rights by state actors.  Cole's suit, therefore, arises
under § 1983.

II.   Eleventh Amendment and Official Capacity Damage Claims

"[I]t is well settled that neither a state agency nor a state official acting in his official capacity may be sued for damages in a section 1983 action."  Fantini v. Salem State Coll., 557 F.3d 22, 33 (1st Cir. 2009) (internal quotation marks and citation omitted).  The Eleventh Amendment bars retrospective actions for damages under section 1983 against an unconsenting state, state agency, or state officers acting in their official capacity.  See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144 (1993) (absent waiver, neither state nor agencies under its control may be subject to suit in federal court); see also Will v. Mich. Dep't of State Police, 491 U.S. 58, 66 (1989) (Congress did not abrogate state's Eleventh Amendment immunity under section 1983).

New Hampshire has not waived its sovereign immunity for claims asserted under 42 U.S.C. § 1983.  Accordingly, the claims for damages asserted against defendants in their official capacities should be dismissed.

III.  Mootness of Injunctive Relief Claims

Cole has requested injunctive relief against defendants in their official capacities.  Cole's transfer to the SHU in Concord has mooted that request.  See Kuperman v. Wrenn, 645

22

F.3d 69, 73 (1st Cir. 2011) (prisoner's release mooted his request for injunctive relief asserted against prison administrators in their official capacities).  Because Cole has not shown any likelihood that he may be transferred back to the NCF Rec/Seg Unit, Cole's claims do not fit within any exception to the mootness doctrine, including the exception for injuries capable of repetition, yet evading review.  See Alvarez v. Smith, ___ U.S. ___, ___, 130 S. Ct. 576, 581 (2009) ("'capable-of-repetition doctrine applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality'" (citation omitted)).  Therefore, the claims for injunctive relief asserted against defendants in their official capacities should be dismissed as moot.

IV.  Conditions of Confinement

Cole has asserted that he suffered a violation of his Eighth Amendment right not to be subjected to cruel and unusual punishment when defendants failed to provide him with: (1) adequate out-of-cell time; (2) an adequate opportunity to exercise; (3) adequate medical care; and (4) adequate mental health care.  An Eighth Amendment claim challenging conditions of confinement contains both an objective and a subjective

23

component.  See Wilson v. Seiter, 501 U.S. 294, 298 (1991).  The objective component requires the plaintiff to demonstrate that he has been subjected to specific deprivations that are so serious that they deny him "the minimal civilized measure of life's necessities."  Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  The subjective component requires the plaintiff to demonstrate that the prison officials acted wantonly, with deliberate indifference to the plaintiff's serious needs.  See Farmer v. Brennan, 511 U.S. 235, 834 (1994); Seiter, 501 U.S. at 298-99.  Deliberate indifference is the reckless disregard of a substantial risk of serious harm.  See Farmer, 511 U.S. at 836.  "Eighth Amendment liability requires more than ordinary lack of due care for the prisoner's interests or safety."  Id. at 835.

A.    Exercise and Out of Cell Time

Exercise is one of the basic human necessities protected by the Eighth Amendment.  See Thomas v. Ponder, 611 F.3d 1144, 1152 (9th Cir. 2010).  Short-term deprivations of exercise or out-of-cell time will not give rise to a viable claim asserting an Eighth Amendment violation.  See, e.g., Umondak v. Ginsel, 426 F. App'x 267, 268 (5th Cir.) (inmate denied 25 days of out-of-cell exercise while housed as transient inmate failed to state

claim of Eighth Amendment violation), <u>cert. denied</u>, No. 11-5765, 2011 WL 3515339 (U.S. Oct. 11, 2011); <u>Phillips v. Norris</u>, 320 F.3d 844, 848 (8th Cir. 2003) (denial of exercise privileges for 37 days did not constitute cruel and unusual punishment); <u>cf. Lopez v. Smith</u>, 203 F.3d 1122, 1133 (9th Cir. 2000) (six-and-one-half week denial of access to outdoor exercise constituted deprivation of minimal civilized measure of life's necessities). An extended period of deprivation of exercise or out-of-cell time, however, may form the basis of an Eighth Amendment claim if such a deprivation is caused by a prison official acting with deliberate indifference to a serious risk of harm to the inmate. <u>See</u> <u>Hernandez v. Velasquez</u>, 522 F.3d 556, 560 n.5 (5th Cir. 2008) ("'deprivation of exercise per se does not violate the cruel and unusual punishment clause,'" although it "may constitute an 'impairment of health' actionable under the Eighth Amendment" (quoting <u>Miller v. Carson</u>, 563 F.2d 741, 751 n.12 (5th Cir. 1977)).

Here, Cole has asserted that he spent between six and seven weeks in his cell in the Rec/Seg Unit without any opportunity each day to walk the tier or to exercise anywhere other than in

his cell or in the dry tanks.[2]  Cole asserts that the lack of out-of-cell time while he was in PAR status caused his mental health problems to worsen and also caused him to suffer physical symptoms, including digestive problems and less physical fitness.

Assuming, without deciding, that the lack of exercise could have caused serious detriment to Cole's physical and mental health, Cole has failed to show that the defendants acted with deliberate indifference to a substantial risk that physical and mental harm would result from denying Cole permission to walk the tier.  Cole has not alleged that any officer withheld permission for Cole to walk the tier with the specific intent to inflict harm on Cole, or that any officer was subjectively aware of, and then ignored, any substantial risk to Cole's physical or mental health that would result from denying Cole permission to exercise out of his cell.

---

[2] Cole spent seven days in the CCU, from December 31, 2010, to January 6, 2011, and forty days in the Rec/Seg Unit.  Cole has not specifically claimed that he lacked an opportunity for exercise or out-of-cell time while in the CCU, where he walked with guards from his cell to retrieve meals and medications at least six times per day.

When Cole asked for permission to walk the tier, Masse did not categorically deny the request, but instead offered Cole daily recreational use of the dry tanks.  Masse denied Cole the opportunity to walk the tier due to his "current [PAR] status." Cole has not alleged any facts suggesting that Masse's safety or security rationale for prohibiting Cole from having tier time was false or overstated.  Cole has thus failed to assert any facts indicating that Masse acted with deliberate indifference in denying Cole out-of-cell time to recreate or exercise.

Cole has similarly failed to show that Thyng acted with deliberate indifference with respect to Cole's need for out of cell time and exercise.  The complaint indicates that Thyng denied Cole's grievance after learning from Masse, or Masse's written records, that Cole had been offered, and had refused, out-of-cell time.  Cole's assertion that Thyng "lied" in response to the grievance is belied by his own concession that he was offered, and rejected, the use of the dry tanks.  Cole has failed to show that Thyng was subjectively aware of but disregarded any substantial risk to Cole that would arise from limiting Cole's exercise to the dry tanks.  Accordingly, the allegations in the complaint are insufficient to state a plausible claim of an Eighth Amendment violation as to any

defendant who had a part in denying Cole out-of-cell time, and the claims based thereon should be dismissed.

     B.   <u>Medical and Mental Health Care</u>

The Supreme Court has adopted a two-part test for reviewing medical care claims under the Eighth Amendment.  See <u>Farmer</u>, 511 U.S. at 834.  A court must first determine if the prisoner has alleged facts sufficient to show that he or she has not been provided with adequate care for a "serious medical need."  <u>Id.</u> Second, the court must determine if the complaint contains sufficient allegations to show that defendants acted with deliberate indifference in failing to provide adequate care to address that serious need.  See <u>id.</u>

To be found deliberately indifferent, a prison official must be both subjectively aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and must also actually draw the inference.  See <u>id.</u> at 837.  Deliberate indifference "may be shown by the denial of needed care as punishment and by decisions about medical care made recklessly with 'actual knowledge of impending harm, easily preventable.'"  <u>Ruiz-Rosa v. Rullan</u>, 485 F.3d 150, 156 (1st Cir. 2007).

Deliberate indifference may be found "in wanton decisions
to deny or delay care, where the action is reckless, not in the
tort law sense but in the appreciably stricter criminal-law
sense." Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993)
(internal citation and quotations omitted).  Allegations that
simply show "substandard care, malpractice, negligence,
inadvertent failure to provide care, and disagreement as to the
appropriate course of treatment are all insufficient to prove a
constitutional violation." Ruiz-Rosa, 485 F.3d at 156.

Cole describes two occasions when he asked for, and was
denied, mental health counseling.  On the first occasion, Cole
felt like he was having an anxiety attack and was
hyperventilating.  On the second occasion, Cole asked to speak
with mental health, but specifically stated that he did not
intend to hurt himself.

Cole has asserted facts showing that he was under the
continuing care of mental health professionals while at NCF, and
he has acknowledged that he received medications and counseling
during the relevant time frame, albeit not immediately on the
two occasions at issue.  Cole has failed to show that any
defendant was subjectively aware that Cole had a serious need
for mental health services, and acted recklessly, or with

deliberate indifference, to that serious need.  Accordingly,
Cole's claim regarding the denial of immediate access to mental
health counseling on two occasions does not state a plausible
claim for relief under the Eighth Amendment.  That claim should
be dismissed.

Cole has also asserted that up to a month passed before he
was able to obtain medications to treat his migraines and
constipation, and that the failure of the medical department to
provide him with multivitamins or a dietary supplement to treat
his symptoms of weakness also constituted a denial of adequate
medical care.  As to his claim regarding vitamins or
supplements, Cole has failed to allege any facts suggesting that
his feeling of weakness presented a serious medical need.

Cole has asserted that nurses in the medical department
declined to provide him with vitamins or supplements, but did
not fail to provide him any treatment.  The nurse provided
medical care and treatment to Cole by advising him to eat more
calories each day to address his feelings of weakness.  Although
advice to eat more was apparently not the specific treatment
Cole sought, Cole cannot base a claim of unconstitutional
medical care on the failure of prison officials to provide him
with the treatment of his choice for a particular condition.

As to Cole's claims regarding constipation and migraines, Cole has alleged that he was able to obtain prescription medications to treat those conditions at the end of December, several weeks after he first submitted an inmate request slip seeking access to such medications through the canteen. Although nothing in the complaint indicates that Cole's migraines and constipation were so severe as to rise to the level of a serious medical need, even if Cole had alleged such a need, he has failed to assert facts suggesting that the delay in prescribing such medication resulted in his being subjected to any serious risk of substantial harm, or that the delay in prescribing medication for him was the result of any prison official's deliberate indifference to that need.  Accordingly, Cole's medical care claims should be dismissed.

V.   Due Process

Cole further asserts that the deprivations he suffered constitute a violation of his due process rights.  Cole has specifically contended that prison officials did not follow prison policies that provide PAR status inmates with certain procedural protections and substantive entitlements to certain services and programs.  To the extent that Cole alleges due process violations relating to excessive force, the denial of

medical care, or other conditions of his confinement, his claims fail to state a separate substantive due process violation and, instead, must be analyzed under the Eighth Amendment.  See Albright v. Oliver, 510 U.S. 266, 273 (1994) (where particular constitutional amendments constrain type of government action at issue, those amendments and not substantive due process provide rule of decision).

Construing Cole's due process claim liberally as intending to assert alternatively that he suffered a deprivation of a liberty interest without due process of law, the court first considers whether Cole has asserted the loss of any protected liberty interest.  The due process clause itself does not grant Cole a right to any of the programs or services that he contends should have been made available to him while in PAR status, including recreation, library access, canteen, or social services.  See Gaona v. Erwin, 224 F. App'x 327, 328 (5th Cir. 2007) (prisoner's loss of recreational and commissary privileges upon reclassification did not implicate loss of any protected liberty interest); Bourdon v. Loughren, 386 F.3d 88, 92 (2d Cir. 2004); Norris, 320 F.3d at 847 (prisoner denied chapel access for thirty-seven days but was not prevented from engaging in religious practices within his cell did not suffer due process

violation); <u>Bullock v. McGinnis</u>, 5 F. App'x 340, 342 (6th Cir.
2001) (prisoner has no constitutional right to rehabilitation,
education, or jobs).

    Similarly, Cole's contentions that prison officials failed
to honor his right to certain procedures, as set forth in the
prison's PAR regulations, and that the officials failed to grant
him access to certain programs and services as required under
such regulations, does not state a due process claim.  The
failure of prison officials to grant Cole any process that he
believes he was entitled to under prison regulations may state a
violation of those regulations, but does not amount to a
violation of his due process rights, unless he can show that
such failure deprived him of a liberty interest, which Cole has
not done.

> [L]iberty interests which are protected by the Due
> Process Clause . . . will generally be limited to
> freedom from restraint which, while not exceeding the
> sentence in such an unexpected manner as to give rise
> to protection by the Due Process Clause of its own
> force, nonetheless imposes atypical and significant
> hardship on the inmate in relation to the ordinary
> incidents of prison life.

<u>Sandin v. Conner</u>, 515 U.S. 472, 484 (1995).  Cole's forty-seven
day lack of access to the full canteen menu, educational
services, social services, recreational programs, library
services, and certain other programs did not amount to such an

atypical or significant hardship.  See, e.g., Umondak, 426 F. App'x at 269 (loss of out-of-cell recreation for 25 days failed to establish due process violation); Norris, 320 F.3d at 847 (prisoner who was denied exercise privileges and access to religious services for 37 days did not suffer atypical and significant hardship); Beverati v. Smith, 120 F.3d 500, 504 (4th Cir. 1997) (conditions imposed during six-month administrative segregation were not atypical, although inmates were confined to their cells all but three to four times per week, and were denied outside recreation, educational services, and religious services); Phillips v. McKie, No. 2:10-2956-HFF-BHH, 2011 WL 1326328, *2 & n.10 (D.S.C. Feb. 15, 2011) (loss of canteen access is not atypical or significant hardship).

The court finds, therefore, that Cole has not shown that he suffered an atypical or significant hardship, or otherwise suffered the deprivation of any liberty interest, in his lack of access to certain privileges, services, and programs during the weeks he spent in PAR status at NCF.  Accordingly, Cole's procedural due process claim should be dismissed.

## VI.   Library and Legal Materials

Cole has asserted that the policies restricting his access to the law library, and to certain legal materials, violated his

34

right of access to the courts.  Prisoners have a constitutional
right to access the courts, which includes a right to the tools
necessary to challenge their criminal cases, convictions, and
sentences directly or collaterally, to file habeas petitions, or
to challenge the conditions of their confinement through civil
rights actions.  See Bourdon, 386 F.3d at 95 (citing Lewis v.
Casey, 518 U.S. 343, 355 (1996)).  Prisoners do not, however,
have a freestanding right to law library access.  See Bourdon,
386 F.3d at 92 (citing Lewis, 518 U.S. at 351).

        To state a constitutional claim for a denial of law library
access, the plaintiff must first show that the available legal
resources, including the law library and other sources of legal
information, taken as a whole, were inadequate to meet his need
to conduct legal research, see Bounds v. Smith, 430 U.S. 817,
832 (1977), and further prove that his legal status was harmed
by a deprivation of legal materials.  See Lewis, 518 U.S. at
351.  With respect to the element of harm, Cole has alleged that
he could not place all of his claims together in the original
complaint due to his lack of access to the law library.  Those
facts do not demonstrate that Cole suffered any detriment to his
litigation as a result.  This court has permitted Cole to file
addenda and amendments to the complaint asserting multiple

claims.  Cole has pointed to no claim that he has been unable to
assert or that has been dismissed because of his lack of access
to legal materials at NCF.  As Cole has failed to demonstrate
that he has suffered any harm, the court should dismiss his
denial of access to the courts claim.

VII. <u>Excessive Force</u>

    Cole has alleged that Officer Schnyder used excessive force
in extracting him from his cell and handcuffing him, causing him
to suffer abrasions on his forearms and wrist, and scarring his
arm.  The Eighth Amendment protects a prisoner from excessive
force that amounts to cruel and unusual punishment.  <u>See</u> <u>Skinner</u>
<u>v. Cunningham</u>, 430 F.3d 483, 488 (1st Cir. 2005).

    In determining whether a plaintiff has stated a claim for
unconstitutionally excessive force, a court should consider the
following factors: (1) the need for the use of force, (2) the
relationship between the need and the amount of force applied,
(3) the extent of injury inflicted, (4) the "threat 'reasonably
perceived by the responsible officials,'" and (5) "'any efforts
made to temper the severity of a forceful response.'"  <u>Hudson v.</u>
<u>McMillian</u>, 503 U.S. 1, 7 (1992) (citing <u>Whitley v. Albers</u>, 475
U.S. 312, 321 (1986)).  In asserting an excessive force claim, a
prisoner need not allege that he has sustained a serious or

significant injury in order to obtain relief.  See Wilkins v.
Gaddy, ___ U.S. ___, ___, 130 S. Ct. 1175, 1178 (2010).

> [T]he extent of injury suffered by an inmate is one
> factor that may suggest whether the use of force could
> plausibly have been thought necessary in a particular
> situation.  The extent of injury may also provide some
> indication of the amount of force applied. . . . [N]ot
> every malevolent touch by a prison guard gives rise to
> a federal cause of action.  The Eighth Amendment's
> prohibition of cruel and unusual punishments . . .
> excludes from constitutional recognition de minimis
> uses of physical force, provided that the use of force
> is not of a sort repugnant to the conscience of
> mankind.

Id. (internal quotations and citations omitted).  "[T]he core
judicial inquiry is . . . whether force was applied in a good-
faith effort to maintain or restore discipline, or maliciously
and sadistically to cause harm."  Hudson, 503 U.S. at 7.

Cole asserts that Schnyder's use of any force, beyond what
was minimally required to handcuff him for the cell search, was
excessive as he was complying with the officer's orders,
presented no risk to the officers, and did not provoke the use
of force.  Cole alleges that Schnyder pulled Cole's hands
through a slot and tightened Cole's handcuffs, causing Cole to
receive abrasions.  Cole also states that he did not receive any
serious injury, the use of force was very brief, and that
Schnyder quickly turned Cole over to CO Watson upon Watson's
request.  Even if Schnyder used more force than was necessary

under the circumstances, Cole's assertions are insufficient to
show that Schnyder's behavior was of a sort "so repugnant to the
conscience of mankind" that it violates the Eighth Amendment.
See id.  The excessive force claims against Schnyder should be
dismissed.

VIII. Harassment

     Cole has asserted that NCF officers harassed him in
retaliation for his submitting grievances and for threatening to
file a lawsuit regarding the lack of out-of-cell time afforded
to Rec/Seg Unit inmates.  The First Amendment shields prisoners
from retaliation in response to their engaging in protected
speech.  Ortiz v. Jordan, ___ U.S. ___, ___, 131 S. Ct. 884, 893
(2011) (citing Crawford-El v. Britton, 523 U.S. 574, 592
(1998)).  To establish a First Amendment retaliation claim,
plaintiff must show: (1) that he was engaged in activities
protected by the First Amendment, (2) that the defendant took an
adverse action against him, and (3) that there was a causal
connection between the protected activity and the adverse
action.  See Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).

A.   Protected Activities

The filing of a non-frivolous prison grievance under established prison grievance procedures, like the filing of an inmate lawsuit, is protected First Amendment activity.  See id. (inmate, in "filing his own grievances and legal actions, plainly engaged in protected activity" (footnote omitted)); Haynes v. Stephenson, 588 F.3d 1152, 1155-56 (8th Cir. 2009). The "mere threat to file suit in the future" may also be construed as an activity protected under the First Amendment. See Powell v. Alexander, 391 F.3d 1, 17 (1st Cir. 2004) (citations omitted).

Here, Cole has asserted that officers harassed him in retaliation for his submitting grievances.  Cole's protected First Amendment activities, for which he claims officers harassed him, included: (1) submitting inmate request slips seeking redress for his complaints; (2) threatening to file a lawsuit against prison officials; (3) requesting grievance forms; and (4) filing grievances.  See Haynes, 588 F.3d at 1155-56; Powell, 391 F.3d at 17.  These actions were protected by the First Amendment, and Cole has thus satisfied the first element of a retaliation claim.

B.    Adverse Acts

To satisfy the second element of a retaliation claim, Cole must show that the defendants took adverse action against him. De minimis reactions to protected speech will not satisfy that requirement.  See Morris v. Powell, 449 F.3d 682, 685-86 (5th Cir. 2006).  De minimis adverse actions addressed to an inmate, that do not suffice to form the basis for a First Amendment retaliation claim, include those minor annoyances or inconveniences that impose only a "'few days of discomfort,'" "'a [single] minor sanction,'" or an "otherwise constitutional restriction."  Starr v. Dube, 334 F. App'x 341, 342 (1st Cir. 2009) (brackets in original) (quoting Morris, 449 F.3d at 685-86).  A defendant's response to plaintiff's protected speech is not de minimis, however, if defendant's conduct would deter an individual of ordinary firmness from exercising his or her First Amendment rights.  See id.

1.    Property, High Beam, Line, and Verbal Harassment

Cole states that he suffered the following adverse acts: (1) he was subjected to a high beam in his cell for a day; (2) he was ordered to remove a clothesline hanging in his cell; (3) he was subjected to cell searches; (4) he was verbally harassed or taunted by corrections officers; (5) he had property briefly

40

removed from his cell; and (6) he had two religious books and
bacitracin taken.  The court cannot find that such acts amount
to treatment that would deter an inmate of ordinary firmness
from speaking out.  See Koch v. Westerman, No. 07-cv-0004-MJR,
2009 WL 249222, *5 (S.D. Ill. Feb. 2, 2009) ("cell searches,
unpleasant looks, and verbal harassment" are "minor annoyances
of everyday prison life and would not support a retaliation
claim"); see also Pope v. Bernard, No. 10-1443, 2011 WL 478055,
*2 (1st Cir. Feb. 10, 2011) (unpublished) (unauthorized cell
search and seizure of a kufi would be actionable if it were
shown to be retaliatory, but prisoner's lack of reasonable
expectation of privacy in his cell rendered the search and
seizure de minimis acts under the circumstances, insufficient to
chill or silence the First Amendment activities of a prisoner of
ordinary firmness).

Cole has failed to allege facts showing that the adverse
acts alleged constituted more than an annoyance or inconvenience
relative to normal prison life.  The court cannot find that the
acts alleged here are sufficiently adverse to chill the First
Amendment activities of an inmate of ordinary firmness.  Cole
has thus failed to demonstrate that the adverse acts relating to
lighting, a clothesline, cell searches, property concerns, and

41

verbal harassment and taunting, satisfy the second element of a
retaliation claim.  Cole's retaliation claims, to the extent
they rely on those acts, therefore, should be dismissed.

    2.   Bunk Issues

    Cole states that he was subjected to an enforced top bunk
assignment for ten days, even though his medications made him
lightheaded and, he claims, rendered him unable to get onto the
top bunk.  A top bunk assignment that is against Cole's wishes,
without more, is a minor inconvenience of prison life.  See
Nunley v. Mills, No. Civ. 3:04-CV-2515-H, 2005 WL 3177108, *4
(N.D. Tex. Nov. 29, 2005) ("for a prisoner not on a 'low bunk'
medical restriction, assignment to an upper bunk does not
constitute an adverse act sufficient to sustain a prima facie
case of retaliation"); Tate v. Campbell, No. 2:00-cv-1041, -
1191, 2002 WL 484708, *7 (S.D. Ohio Feb. 28, 2002) (removal of
ladder from cell and requirement that inmate jump to top bunk do
not qualify as adverse acts).  An exception to the general rule
may arise, however, if an inmate had a medical need for a bottom
bunk assignment, or if other adverse consequences result from
the assignment.  See Nunley, 2005 WL 3177108, at *4; Tate, 2002
WL 484708, at *7.

In this case, Cole has asserted that the top bunk
assignment was an adverse act because his medications, physical
condition, lack of a step, and the bunk configuration resulted
in him hurting himself when he attempted to climb to the top
bunk.  Cole has further asserted that when he refused to comply
with his top bunk assignment, he was not allowed to sleep on a
mattress on the floor, and he was therefore forced to sleep on
an unsanitary floor without a mattress for two nights.  Cole's
complaint reveals, however, that despite Cole's own belief that
he needed a bottom bunk for medical reasons, according to prison
medical personnel, he had no medical issues or injuries that
would necessitate a bottom bunk assignment.

The enforcement by corrections officers of a top bunk
assignment, for an inmate who has been deemed to lack medical
issues or injuries requiring a bottom bunk assignment, is
inadequate to form the basis for a finding that those officers
engaged in an adverse act that would support a retaliation
claim.  Cole's retaliation claims based on issues related to his
bunk and mattress should therefore be dismissed.

### 3.   Disciplinary Charges

Cole alleges that he was charged with multiple disciplinary
violations for failing to comply with his top bunk assignment,

and that those charges, apart from the top bunk assignment itself, constituted retaliatory adverse acts.  Consideration of whether the disciplinary charges are adverse acts requires an assessment of whether the charges, and their consequences, were themselves more than de minimis acts, capable of deterring an inmate from exercising his First Amendment rights.  See Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (inmate subjected to retaliatory disciplinary charges and subsequent punishment that would deter an inmate of ordinary firmness from exercising his First Amendment rights may be entitled to relief under section 1983 (citing Franco v. Kelly, 854 F.2d 584, 590 (2d Cir. 1988))); see also Bridges v. Gilbert, 557 F.3d 541, 555 (7th Cir. 2009) ("single retaliatory disciplinary charge that is later dismissed is insufficient to serve as the basis of a § 1983 action"); Starr, 334 F. App'x at 342 (single disciplinary charge, carrying risk of severe penalties upon guilty finding, which was dismissed by hearing officer one week after it was filed, was de minimis act).

Here, the investigator who reviewed Cole's disciplinary charges, while finding the disciplinary reports to be true, recommended processing the reports as "minor disciplinary" charges.  Exs. P-T to Am. Compl.  Cole has not stated whether he

44

was found guilty on those charges, but the court presumes, for
purposes of preliminary review, that the charges were not
dismissed.  Even considering the number of charges, however,
Cole has failed to allege facts suggesting that he was falsely
charged, that he was severely punished, or that he suffered any
ill effect as a result of the charges.  Nothing in the complaint
inclines the court to find that the disciplinary charges or the
ensuing disciplinary proceedings, to the extent they may have
caused Cole any harm at all, amounted to more than de minimis
acts, insufficient to support a retaliation claim.  Cole's
retaliation claim based on the disciplinary charges should
therefore be dismissed.

### 4.   Cell Extraction and Handcuffing

Cole has also asserted that Officer Schnyder's use of force
in extracting him from his cell and handcuffing him on December
18 was retaliatory for Cole's protected conduct.  In certain
cases, a suggestive temporal proximity, departure from standard
operating procedures, and the chronology of events may provide a
basis for allowing a First Amendment retaliation claim to
proceed.  See Hannon, 645 F.3d at 49.  Here, Cole has cited
facts showing a chronology and a temporal proximity of about one
week between his initiating the grievance process relating to

the lack of tier time, and Schnyder's December 18 actions, but

those facts do not suffice to establish the requisite causal

connection.  The complaint provides no factual allegations

showing that Schnyder, on December 18, knew that Cole had

initiated the grievance process or had otherwise threatened

litigation, relating to the lack of out-of-cell time.

Further, as discussed above, Cole cannot demonstrate that

Schnyder's actions on that date amounted to any more than a de

minimis use of force, resulting in non-serious injury.  The

court finds that such actions would be insufficient to chill the

First Amendment expression of an inmate of ordinary firmness.

Accordingly, Cole's retaliation claim based on Schnyder's

December 18 use of force on Cole should be dismissed.

          5.   Thyng's Comment

On December 29, Cole asserts that Thyng threatened him with

more time in the Rec/Seg Unit, in retaliation for Cole's

manifesting an intent to file grievances about conditions in the

unit.  On that date, Thyng advised Cole that filing grievances

would extend his stay in the unit, so that the grievances could

be investigated.  Cole interpreted the remark as an "indirect

threat, maybe to coerce me into not writing the grievances."

"[T]hreats alone can constitute an adverse action if the threat is capable of deterring a person of ordinary firmness from engaging in protected conduct." Hill v. Lappin, 630 F.3d 468, 474 (6th Cir. 2010). A threatened transfer to a more restrictive living environment with fewer privileges may be found capable of deterring an inmate of ordinary firmness from exercising First Amendment rights. See id.

Here, however, Cole has failed to allege sufficient facts from which the court can conclude that Thyng's remark was the functional equivalent of a threatened transfer to more restrictive conditions, or was otherwise more than a de minimis adverse act. The court notes that Thyng told Cole that filing grievances would cause his stay in the Rec/Seg Unit to be extended in order to allow time to investigate the grievances. On the record presently before the court, there is no reason to presume that Thyng was doing any more than providing Cole with information about the practical consequences of his actions. Further, while Thyng's tone and demeanor cannot be gleaned from the present record, Cole has not asserted any fact - except his own interpretation of Thyng's statement – to allow the court to find that the statement could plausibly be understood to be a veiled threat. Accordingly, the court should dismiss the

47

retaliation claim based on Thyng's statement as it fails to assert any adverse retaliatory act.

### 6. December 31, 2010, Transfer to CCU

Cole asserts that Cpl. Dube transferred him to the CCU on December 31, 2010, in retaliation for engaging in activities protected by the First Amendment.  In general, a transfer to another unit is not an adverse act, unless the conditions there impose more restrictions and offer fewer privileges.  See Hill, 630 F.3d at 474.  Courts have also found that a retaliatory transfer of an inmate to a more dangerous section within a prison constitutes more than de minimis harm.  See Morris, 449 F.3d at 687 (citing Parker v. Carpenter, 978 F.2d. 190, 192-93 (5th Cir. 1992)).

Here, Cole has contended that the transfer resulted in his being returned to a more dangerous housing unit, but he has failed to show that Dube or any other defendant was aware that transferring Cole back to the CCU as a single-celled PAR status inmate would endanger Cole.  To the contrary, it appears a number of steps were taken to protect Cole from the other CCU inmates when he was transferred back to CCU: (1) he was celled alone and did not have any direct contact with the other inmates on the unit; (2) he was locked down in his cell when other

inmates were on the tier; and (3) an officer escorted him alone
to retrieve his meals and medications while the other inmates
remained in their cells.  While it ultimately proved to be the
case that despite those precautions, inmates verbally harassed
Cole and, on one occasion, squirted urine and feces under his
door, those acts are not attributable to Dube, or any prison
official, and the court has before it no information suggesting
that any defendant encouraged, caused, or otherwise bore any
responsibility for those acts.

Because Cole has not asserted any facts suggesting that the
threat of facing a one week transfer to the CCU, under the
circumstances described in the complaint, would deter an inmate
of ordinary firmness from exercising his First Amendment rights,
the court finds that Cole has failed to state a plausible claim
of retaliation based on that transfer.  Accordingly, Cole's
retaliation claim based on the transfer to the CCU should be
dismissed.

IX.  Supervisory Liability

Cole has named two supervisory officials as defendants to
this action, Sgt. Masse and Unit Manager Thyng.  A supervisor
cannot be held liable per se for the federal constitutional

violations of his or her subordinates.  See Iqbal, 556 U.S. at
___, 129 S. Ct. at 1949.  "[S]upervisory liability lies only
where an affirmative link between the behavior of a subordinate
and the action or inaction of his supervisor exists such that
the supervisor's conduct led inexorably to the constitutional
violation."  Maldonado v. Fontanes, 568 F.3d 263, 275 (1st Cir.
2009) (internal quotation marks and citation omitted).  Here,
Cole has failed to show that any subordinate or supervisor at
NCF caused or acted in a way that "led inexorably" to any
violation of Cole's constitutional rights.  Accordingly, all of
the supervisory claims asserted in the complaint should be
dismissed.

### Conclusion

For the foregoing reasons, all of the claims asserted in
this action should be dismissed.  Any objections to this report
and recommendation must be filed within fourteen (14) days of
receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  Failure
to file objections within the specified time waives the right to
appeal the district court's order.  See Sch. Union No. 37 v.

United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010); United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008).

_____
Landya McCafferty
United States Magistrate Judge

November 8, 2011

cc:  Christopher Cole, pro se

LBM:nmd